George R. TURNER

v.

AMERICAN DREDGING COMPANY.

Civ. A. No. 74–1142.

United States District Court,
E. D. Pennsylvania.

Feb. 26, 1976.

Arnold Levin, Philadelphia, Pa., for plaintiff.

Joseph P. Green, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

HUYETT, District Judge.

Claiming relief under both the Jones Act, 46 U.S.C. § 688 (1970), and under general maritime law, plaintiff George

Turner has brought this action for injuries allegedly suffered when he fell down an engineering room ladder aboard the Tug Dover sometime during the Fall of 1969.[1] Since plaintiff did not file his complaint until May 3, 1974, defendant now contends that plaintiff's Jones Act claim is barred by the three-year statute of limitations applicable here[2] and his claims of unseaworthiness and for wages and maintenance and cure by the doctrine of laches. Plaintiff, in turn, maintains that defendant's conduct in securing a 1971 release from plaintiff equitably estops defendant from invoking the statute of limitations and that defendant has not demonstrated the prejudice necessary to establish a defense of laches. Because the relevant case law in this circuit holds that the issues raised by claims of equitable estoppel and laches are both for the court and not the jury,[3] we held a non-jury trial on July 15, 1975, pursuant to Fed.R.Civ.P. 42(b), limited to these issues.[4]

Plaintiff's evidence at trial consisted of the testimony of plaintiff George Turner, Richard Schiller, a claims representative for Hartford Insurance Co., defendant's insurance carrier, and three exhibits comprised primarily of materials from defendant's investigative file on this case. According to plaintiff's testimony, the following events transpired in the summer of 1971, the force of which, plaintiff urges, must lead us to find that his delay in bringing suit was excusable and that defendant is estopped from raising the statute of limitations as a defense. In August 1971 Richard Schiller, with whom plaintiff had had several

---

1. There exists some confusion on the present record over how many separate accidents and injuries plaintiff alleges. In his complaint plaintiff lists two accidents, with injuries arising from each, one aboard the Tug Dover in November 1969 and one aboard the Tug Salem in April 1970. (The complaint states the latter date to be April 1971, but the parties have agreed and the investigative reports show that the date was April 1970). Although this ambiguity must eventually be resolved, it does not affect our present determination.

2. The Jones Act incorporates the three-year statute of limitations prescribed under the Fed-

eral Employers' Liability Act. 46 U.S.C. § 688 (1970); 45 U.S.C. § 56 (1970).

3. Since plaintiff has demanded a jury trial, as is his right under the Jones Act but not under his general admiralty claims, a finding that his Jones Act claim is barred also bars his right to a jury trial.

4. With regard to the doctrine of equitable estoppel, see Burke v. Gateway Clipper, Inc., 441 F.2d 946, 948 (3d Cir. 1971); with regard to the doctrine of laches, see Gruca v. United States Steel Corp., 495 F.2d 1252, 1258 (3d Cir. 1974).

prior contacts,[5] informed plaintiff that unless he fully settled his claims against defendant by October 1971, he would lose all claims for medical expenses and for maintenance and cure.[6] Mr. Schiller offered the sum of $30,000 in settlement but told plaintiff in the presence of plaintiff's wife that Hartford would continue, in addition to the payment of $30,000, to pay plaintiff's medical expenses and that the settlement figure covered only back wages. Plaintiff can't recall whether or not Mr. Schiller ever explained the rights of seamen to him, but he does remember that Mr. Schiller never showed him any medical reports or talked to him about the extent of his back injury. Mr. Schiller did tell him, however, that he would be able to go back to work. On August 10, 1971, Mr. Schiller and another man, who plaintiff believed to be a notary, visited plaintiff at Hillside House, a convalescent home, and plaintiff signed a release form. Mr. Schiller never advised plaintiff to get an attorney.

In further support of his contention that his general admiralty claims are not barred by laches, plaintiff offered in evidence a packet of materials which document the extent to which defendant had collected investigative information to aid in the trial of this action. The packet contains, among other documents, witness statements, investigative reports, and medical reports. Moreover, on cross-examination, Laverne Shiffer, Hartford's regional claims supervisor in charge of plaintiff's case, testified that all witnesses were still available, that the Tug Dover was surveyed as late as 1975, that most relevant medical reports were already in defendant's hands, and that medical reports on a newly-discovered prior back injury were probably available as well. Finally, in answer to the

question from plaintiff's counsel, "From an investigative point of view how was Hartford prejudiced by this late filing?", Mr. Shiffer replied, "From an investigative standpoint? Probably not at all." N.T. 60.

Defendant's direct evidence at trial included the testimony of Laverne Shiffer and two exhibits. We note, however, that certain testimony of Richard Schiller both on direct and on cross-examination supported defendant's contentions. Mr. Shiffer testified generally about his evaluation of plaintiff's claim prior to the 1971 settlement; he specifically testified that in evaluating the claim he considered "the traditional ingredients to a Jones Act, maritime unworthiness cause of action." N.T. 50. Not surprisingly, Richard Schiller's testimony on his dealings with plaintiff during the summer of 1971 differed markedly from plaintiff's testimony. According to Mr. Schiller the following occurred. During the summer of 1971 plaintiff and he negotiated the settlement of all of plaintiff's claims against defendant. Plaintiff instigated the negotiation when he told Mr. Schiller that he wanted to invest in some land. Although Mr. Schiller's memory is hazy on this point, he thinks plaintiff suggested the $30,000 figure. In any case he received authority to offer plaintiff the $30,000 but only if that figure included $12,000 already paid for medical bills and maintenance and cure. When Mr. Schiller outlined the offer to him, plaintiff rejected it insisting that he wanted $30,000 exclusive of amounts allotted to prior claims. Eventually, Mr. Schiller was given authority to meet plaintiff's demands and arrangements were made for Mr. Schiller and his attorney, Roger Sanders, to meet with plaintiff at Hillside House on August 10, 1971, to sign the settlement papers. Pri-

---

5. Up to August 1971 Hartford, through Mr. Schiller, had paid plaintiff approximately $12,000 covering medical bills and maintenance and cure.

6. Plaintiff's precise testimony reads:

Well, the exact words, I can't say—I don't remember them—but it is to the effect that

if I didn't take a settlement then and get it over with in two months, I believe— . . . which would have been somewhere around October of that year, after that, I wouldn't be able to get anymore bills or maintenance or anything, if I didn't have a settlement then.

or to the meeting Mr. Schiller told plaintiff he was going to bring an attorney with him. Mr. Schiller agrees with plaintiff that he never advised plaintiff to get his own attorney and that he neither discussed plaintiff's prognosis with him the day of settlement nor did he at any time provide plaintiff with medical reports. Mr. Schiller did not, however, tell plaintiff that he would be "all right medically." Nor did he tell plaintiff that he had to settle at a specific time because his benefits would otherwise run out. Last, he never told plaintiff anything but that in exchange for a total sum of $42,000, he was fully releasing all claims against defendant.

Defendant's two exhibits, admitted into evidence, consisted of a letter, dated August 10, 1971, from attorney Sanders to Hartford, recounting his version of the settlement meeting at Hillside House, and a written statement by plaintiff, dated May 13, 1971, and given to Richard Schiller. The letter from attorney Sanders states that he attended the meeting at Hillside House on August 10th along with a notary public whom he brought from his office [7] and that he found plaintiff alert and fully cognizant of the circumstances of the meeting. The letter further relates that:

> Mr. Turner read the "Rights of Seamen" form and then I reviewed each of the three sections with him, briefly. He then explained to me his understanding of the three sections of the form and it was clear in my mind that he fully understood the form. . .

> Having read the "Rights of Seamen" form and indicating that he understood the form, Turner printed in his name and address, in his own hand, and then added his signature to the form. The signature was notarized.

> Turner then reviewed the release and made it plain that he fully understood that it was a complete release for all his claims. He inserted, in his writing, his name and age near the top of the release form, the word "release" near the middle of the release form, the answers to the five questions near the bottom of the release form, and added his signature in the space provided near the bottom of the form. The balance of the entries on the face of the release are in my hand writing and were inserted on the release prior to Turner's signature on the release. On the reverse side of the release are the signatures of three witnesses (me, Mr. Schiller and the Notary Public) and Turner's signature was then notarized.

> Mr. Schiller's records indicated that past payments (including a bill from Dr. LeRoy in the amount of $865 that was to be paid today) amounted to $11,464.95. The additional payment being made today was $30,000 and the release recites the gross consideration of $41,464.95. In addition, Mr. Schiller and Mr. Turner had an understanding that Mr. Schiller would also pay a $31 bill for medication and the bill at Hillside House through today.

Plaintiff's May 13th statement is offered primarily for plaintiff's statement that:

> I was operated on again by Dr. Gopez. He said the nerves were irritated by old scar tissue and thought the nerve was permanently damaged. Gopez says there is nothing more surgically he can do.

Defendant's Ex. # 2 at 3. Related to this statement is another statement made by plaintiff during the following exchange on cross-examination:

> Counsel for defendant: Is it not true that they [plaintiff's doctors] told you that they could not tell what the future would be?

> Plaintiff: There is no way he could guarantee me that I would ever be out of pain, no.

N.T. 42.

---

**7.** The file in this action contains the deposition of a notary public who testified that she did accompany Mr. Sanders to the settlement and notarize the appropriate documents. At trial counsel agreed that we could consider the record depositions to any extent we found them relevant. N.T. 60–61.

Having weighed carefully all the evidence just now recited as well as some pieces of evidence which we will mention presently and having applied the law of this circuit to the facts as we find them, we now hold that defendant is not equitably estopped from invoking the applicable statute of limitations to bar plaintiff's claim under the Jones Act. We hold further, however, that plaintiff's general maritime claims are not barred by the doctrine of laches.

In *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 948 (3d Cir. 1971), the Court of Appeals for the Third Circuit, in a situation similar to ours, described the doctrine of equitable estoppel in this way:

> The equitable principle which will allow "no man . . . [to] take advantage of his own wrong," will prevent a defendant, whose representations or other conduct have caused a plaintiff to delay filing suit until after the running of the statutory period, to assert the statute of limitations as a bar to the action.

The court went on, however, to require a plaintiff invoking the doctrine to show that he was misled into delay either by

> (a) an affirmative statement that the statutory period to bring the action was longer than it actually was, or (b) promises to make a better settlement of the claim if plaintiff did not bring suit or (c) comparable representations and conduct.

441 F.2d at 949 (citations omitted). Since there is no claim that category "a" or "b" fits our situation, we are left only with category "c," one obviously designed for flexibility. We need not decide, however, if misrepresentations of the kind plaintiff alleges are contemplated by category "c" since we find that defendant, through its agents, did not misrepresent or mislead plaintiff into delaying suit.

█ To begin, we cannot accept plaintiff's characterization of himself both on the stand and in pre- and post-trial briefing as totally unsophisticated, uninformed, and put upon by defendant's agents. Plaintiff insists that he relied on Mr. Schiller for information about his medical condition and that Schiller misled him into believing his prognosis was favorable. Such insistence is simply not credible. Even in the absence of any contradictory evidence, we would find it difficult to believe that plaintiff did not directly consult his own doctors for medical information regardless of his trust in Mr. Schiller. Here, however, two of plaintiff's own statements contradict his assertions that he was uninformed, for whatever reason, about his medical condition. At trial plaintiff testified that his doctors told him his future was uncertain and that they could not guarantee him that he would "ever be out of pain." N.T. 41–42. Moreover, in the May 13th out-of-court statement (Defendant's Ex. # 2), plaintiff acknowledged that Dr. Gopez had diagnosed permanent nerve damage and had told him there was nothing more surgery could do. Nor can we credit plaintiff's alleged naiveté when confronted with the world of attorneys, lawsuits, and settlements. Plaintiff himself testified that he had previously retained an attorney to handle a marine personal injury suit that eventually settled. N.T. 42–43. In addition, plaintiff testified that he considered a Delaware attorney named Gallagher his family attorney and had retained him two or three times over the years. N.T. 38–39. Perhaps most incongruous with plaintiff's characterization of himself as one of the proverbial lambs is Richard Schiller's uncontradicted rendition of the settlement negotiation in which plaintiff held out for a total settlement of $42,000 including past payments rather than accepting the original offer of $30,000 including past payments. N.T. 25–26. Finally, we note that plaintiff's wife did not testify although plaintiff stated that she was present when Mr. Schiller made the oral promise to continue paying plaintiff's medical bills. N.T. 44.

In contrast to our response to plaintiff's testimony, we credit the testimony

of Richard Schiller that he did not, in effecting settlement, attempt to mislead plaintiff in any way—either by telling him payments would cease if plaintiff did not settle, or by deliberately concealing information about plaintiff's medical condition, or by presenting the settlement offer as anything but an offer to settle all claims by plaintiff against defendant. Plaintiff makes much of Mr. Schiller's testimony that in evaluating plaintiff's claim, he did not break down the claim and separately evaluate its elements. Not only do we find this so-called dereliction of less than overriding significance, we also note that Mr. Shiffer, Hartford's regional claims supervisor, did testify that he had evaluated the separate elements of plaintiff's claim. N.T. 50–51. In accepting defendant's and not plaintiff's version of the crucial events leading to this litigation, we also find highly persuasive the letter of attorney Roger Sanders (Defendant's Ex. # 1), dated the day of the settlement and obviously written well before this lawsuit commenced. Although Mr. Sanders did not testify at trial, his version of the events narrated in his deposition[8] corroborates his earlier letter. In his letter, the pertinent portions of which are set out in the text at p. 1050, Mr. Sanders described a formal settlement meeting during which he apprised plaintiff fully and specifically of both his rights as a seaman and the terms of the settlement. By having plaintiff explain to him, in turn, plaintiff's understanding of the "Rights of Seamen" and release forms, Mr. Sanders satisfied himself of plaintiff's comprehension.

In sum, we find that plaintiff was not misled by defendant's agents into delaying the institution of this lawsuit. Since this is so, there are no grounds for our holding defendant equitably estopped from invoking the three-year statute of limitations. Accordingly, defendant having invoked the statute, we must dismiss plaintiff's claim for relief under the Jones Act.

Although a finding that plaintiff was not misled into delay is relevant to the question of whether or not plaintiff's general admiralty claims are barred by laches, it alone does not dispose of the issue. In this circuit a court applying the equitable doctrine of laches to a particular factual configuration must engage in a two-step analysis. First, the court must identify the party bearing the burden of proof and then test this party's evidentiary showing on the nature of the delay involved and the amount of prejudice suffered against this burden. In *Churma v. United States Steel Corp.*, 514 F.2d 589, 593 (3d Cir. 1975), the Court of Appeals for the Third Circuit, correlating its own prior opinions, explained:

Before *Gruca* [*v. United States Steel Corp.*, 495 F.2d 1252 (3d Cir. 1974)], the Third Circuit rule concerning burden of proof as to laches was that enunciated in *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946 (3d Cir. 1971), which was relied upon by the district court in this case. *Burke* recognized that other circuits required the defendant to prove laches as an affirmative defense, but reaffirmed that in this circuit the plaintiff had to "come forward and prove that his delay was excusable and that it did not unduly prejudice the defendant." 441 F.2d at 949. *Gruca*, while consistent with *Burke*, made clear that the allocation of the burden depends on whether the statute of limitations has run. Prior to the running of the statute, the defendant has to prove laches, but thereafter the plaintiff has to disprove laches. 495 F.2d at 1259 and n. 8.

Since the relevant statute of limitations here is the three-year statute applied under the Jones Act, the burden of proof falls not, as plaintiff contends, on defendant but on plaintiff himself who filed suit more than three years after his cause of action arose. Thus plaintiff must demonstrate that what we have, in effect, already found to be an unexcused

---

8. We note again that we consider deposition testimony under an agreement between the parties.

delay in bringing suit did not prejudice defendant's position in this litigation since

laches "is much more than time. It is time plus prejudicial harm, and the harm is not merely that one loses what he otherwise would have kept, but that the delay has subjected him to a disadvantage in asserting and establishing his claimed right or defense."

*Molnar v. Gulfcoast Transit Co.,* 371 F.2d 639, 642 (5th Cir. 1967) (citation omitted). The need to make such a showing, of course, places plaintiff in the difficult position of having to prove a negative— that his delay did not prejudice defendant's ability to defend. Difficult as this task may be, however, we find that plaintiff has shouldered his burden. Plaintiff's trial exhibits consisted substantially of defendant's investigative and medical file on plaintiff. These exhibits combined with the testimony of Laverne Shiffer, Hartford's regional claims supervisor, demonstrate persuasively that defendant is as well prepared now as it would have been in 1972 or 1973 to defend this action. Witnesses and medical data are still available; defendant has recently surveyed the Tug Dover, and, in the opinion of Mr. Shiffer, defendant's ability to investigate the claims in this action has not been at all undermined. N.T. 60. We find, therefore, that plaintiff's general admiralty claims are not barred by laches and the trial of these claims, non-jury, may proceed.

This opinion constitutes our findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).